E-FILED
Monday, 20 March, 2006 12:31:36 PM
Clerk, U.S. District Court, ILCD

COUNTY OF WILL ) SS

# AFFIDAVIT

I, James Delso, being first duly sworn under oath, depose and state as follows:

1.)That the Public Defender of Macon County, James Brinkoette was appointed to represent me in case no.94-CF-482.

2.)That on Nov.14,1994 defendant entered a plea of guilty to First Degree Murder.

3.)That att. Brinkoette failed to investigated or interview serveral who would have testified that defendant did not commit the crime, but that the state's witness did. Defendant cites this case in support of his issue. United States v.Tucker, 716 F.2d 576, 583 n. 16 (9th Cir.1983) see also Harris by and through Ramseyer v. Blodgett, 853 F.Supp. 1239 (W.D Wash. 1994)

4.)That att. Brinkoette failed to properly impeach state's witnesses regarding there prior inconsistent statements. Defendant cites this case in support of his issue. People v.Corder, 103 ILL.App.3d 434, 431 N.E.2d 701, 59 Ill.Dec. 200.

5.)That the state's attorney failed to disclose exculpatory (material) evidence. Defendant cites this case in support of his issue. Brady v. Maryland, 373 U.S. 83, 10 L.ed.2d 215, 83 S CT. 1194.

6.)That the trial court failed to comply with the guilty plea admonishments.

7.)That the trial court abused its decretion when the judge considered another crime that the petitioner was not yet convicted of as evidence when the comment's where prejudicial.

8.) That the trial court abused its decretion when the judge denied him a fair hearing on his motions.

9.) That the trial judge submitted into evidence witnesses who have received immunity for there testimony and who admitted to being under the influence of drugs.

10.)That his att. Brinkoette coerce him into pleading guilty, where the evidence would have shown that he did not commit the

crime, which further proves actual innocence.

11.) That his att. Brinkoette failed to comply with Supreme Court Rules 402. 604 (D)

12.)That att. Brinkoette refused to withdraw defendant's guilty plea and argue meitious issues that could have proven defendant's innocence.

13.) Defendant contends that he have tried to submit affidavits from all witnesses in this case but was unsuccessful in contacting these witnesses.

14.) Defendant also contends that he have tried contacting these witnesses by mail, and telephone but was unable to reach them.

15.) Defendant contends that in support of these allegations he have attached letters written to the witnesses in support of his issue, failed to investigate and interview. Defendant cites People v. Coleman, 233 Ill.Dec. 789, 701 N.E.2d 1063 (Ill. 1998)

16.) I have read the facts contained in this affidavit and they are true and correct to the best of my knowledge. I offer this in support of my Post-Conviction Petition .

S/S [signature]

Subscribed and sworn to before me this 25th day of July 2000.

[signature]
NOTARY PUBLIC

"OFFICIAL SEAL"
SANDRA SCHWAB
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/8/2001

SS

UNTY OF WILL

AFFIDAVIT

I, James Delso, being first duly sworn under oath, depose and state as follows:

1.) That during the month of Nov. 1994 defendant met with attorney, who advised defendant that he should plea guilty because the evidence is pointing at him.

2.) That said attorney Brinkoette told defendant during the meeting that he don't have a chance in beating this case.

3.) That during this meeting with attorney Brinkoette, I advised him that I did not commit this crime.

4.) That during this meeting with attorney Brinkoette he advised defendant that they will not have a fair trial in this court room.

5.) That during this meeting with attorney Brinkoette he told me that pleading guilty would be best for me because if I go to trial and found guilty the state's attorney is seeking to give me a 100yrs..

6.) After looking at the local newspaper I realize that this information was true.

7.) Defendant contends that this latter evidence that is presented in this post-conviction would have damaged the state's case in hand.

8.) Defendant also contends that this evidence would have gave great doubt to who really commit this crime if gone to trial.

S/S [signature]

Subscribed and sworn to me this 25th day of July 2000.

[signature]
NOTARY PUBLIC

"OFFICIAL SEAL"
SANDRA SCHWAB
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/8/2001

C-22

IN THE CIRCUIT COURT OF MACON
ʕ TH JUDICIAL DISTRICT

EOPLE OF THE STATE OF ILLINOIS,
PLAINTIFF,

VS. CASE NO.94-CF-482

JAMES DELSO,
DEFENDANT.

MEMORANDUM OF LAW

PETITINER JAMES DELSO MEMORANDUM OF LAW IN SUPPORT OF HIS POST-CONVICTION PETITION.

In support of his poistion, defendant points out that a post-conviction petitioner is entitled to an evidentiary hearing when the allegation in the petition make a substantial showing of a deprivation of rights under the United States and/or Illinois Constitution. In determining whether an evidentiary hearing is required, the circuit court must take all well-pleaded facts in the petition and affidavits as true. see People v. Caballero, 126 Ill.2d 248, 128 Ill.dec. 1, 533 N.E.2d 1089 (1989).As such, defendant contends, the issues raised in this case are purely legal and the decision of the circuit court in this regard are not entitled to any deference by a court of review.

Defendant contends that a proper standard of review cannot be articulated without first examining the substantive and procedural backdrop against which the appealed order or ruling arouse. The Illinois Post-Conviction Hearing Act provides a mechanism by which those under criminal sentence in this state can assert that their conviction were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. see 725 ILCS 5/122-1 (WEST 1994). Proceedings under the Act are commenced by the filing of a petition in the circuit court in which the original proceeding took place. The petition must clearly set forth the respects in which the petitioner's rights were violated. see 725 ILCS 5/122-2 (WEST 1994). Section 122-2 of the Act requries that affidavits, records, or other evidence supporting the petition's allegations

be attached to the petition. see 725 ILCS 5/122 2 (WEST 1994) Section 122-2.1 of the Act directs the circuit court to dismiss the petition if the petitioner is sentenced to imprisonment and if the court determines that "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(A)(2) (WEST 1994);SEE also People v. Brisbon, 164 Ill.2d 236, 242-43, 207 Ill.Dec. 442, 647 N.E.2d 935 (1995) (discussing the Act's differing procedures for prisoner under sentence of death and those sentenced to imprisonment). If a petition is not dismissed under section 122-2.1, then it is to be docketed and considered in accordance with sections 122-4 through 122-6 of the Act (725 Ilcs 5/122-2.1(b) )WEST 1994). Under section 122-6, the court may receive proof by affidavits, depositions, oral testimony or other evidence. If the court finds in favor of the petitioner, it shall enter an appropriate order. see 725 ILCS 5/122-6 (WEST 1994).

As the foregoing statutory scheme makes clear, post-conviction relief is limited to constitutional deprivations which occurred at the original trial. The court has contrued the Act to require "that when a petition is filed invoking the act, the trial court shall examine the petition with a view to determining whether the allegations of fact, liberally construed in favor of the petitioner, and taken as true, make a showing of imprisonment in violation of the Federal or State constitution such as, for example, conviction by the use of testimony known by the prosecuting officers to be perjured, conviction upon a coerced confession, coecion of a plea of guilty, or that the accused was prevented by public officials from summoning witnesses in his defense.

If the petition so charges, the trial court should ascertain whether it is supported by accompanying affidavits and if not, whether the absence of such affidavits is sufficiently explained and excused by the petitioner's own sworn statements. Where there are no supporting affidavits and their absence is neither explained nor excused, the trial court should either dismiss the petition or grant a further time within which such affidavits may be obtained.

A petition meeting these requirements, both to substantial allegation of the denial of a constitutional right as to affidavits, is sufficient to invoke the act. Such a petition calls for an answer from the State's Attorney and a hearing on the merits." People v. Jennings, 411 Ill. 21, 26, 102 N.E.2d 824 (1952).

Thus, at the dismissal stage of a post-conviction proceedings, whether under section 122-2.1 or under section 122-5, the circuit court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief under the Act. The circuit court is foreclosed from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding. People v. Caballero, 126 Ill.2d 248, 259, 128 Ill.Dec.1, 533 N.E.2d 1089; see also People v. Wegner, 40 Ill.2d 28, 31-32, 237 N.E.2d 486 (recognizing that factual disputes raised by the pleading require a determination of the truth or falsity of the supporting affidavits or exhibits, a determination which cannot be properly made at a hearing on the motion to dismiss, but rather can only be resolved through an evidentiary hearing).

Although a post-conviction petitioner is not entitled to an evidentiary hearing as a matter of right, this court has repeatedly stressed that a hearing is required whenever the petitioner makes a substantial showing of a violation of constitutional right. see, e.g., People v. Hobley,182 Ill.2d 404, 428, 231 Ill.Dec.321,696 N.E.2d 313 (1998); People v. Gaines, 105 Ill.2d 79, 91-92, 85 Ill.Dec. 269, 473 N.E.2d 868 (1984). To accomplish this, the allegation in the petition must be supported by the record in the case or by its accompanying affidavits. Gaines, 105 Ill.2d at 91-92, 85 Ill.Dec. 269, 473 N.E.2d 868. Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require ahearing under the Act. People v. West, 43 Ill.2d 219, 223, 252 N.E.2d 529; People v. Smith, 40 Ill.2d 562, 564, 241 N.E.2d 413. The court note that if the allegation contained in the petition are based upon matters of record, no extrinsic evidence may be required. see People v. Jones, 66 Ill.2d 152, 157, 5 Ill.Dec. 576, 361 N.E.2d 1104 (noting that a court may properly dismiss a post-conviction petition if the record of proceeding at trial shows the petition

CONT.

to be nonmeritorious); People v. Morris, 43 Ill.2d 124, 128, 251 N.E.2d 202 (holding that upon a motion to dismiss, the circuit court may render its decision on the basis of what is contained in the pleading, considered with the transcript of the proceeding ).The court has consistently upheld the dismissal of a post-conviction petition when the allegation are contradicted by the record from the original trial proceedings. Gaines, 105 Ill.2d at 91-92, 85 Ill.Dec. 269, 473 N.E.2d 868; People v. Arbuckle, 42 Ill.2d 177, 182, 246 N.E.2d 240. When a petitioner's claims are based upon matters outside the record, the court has emphasized that "it is not the intent of the Act that such claims be adjudicated on the pleading." People v. Airmers, 34 Ill.2d 222, 226, 215 N.E.2d 225. See also People v. Clements, 38 Ill.2d 213, 216, 230 N.E.2d 185. Rather, the function of the pleading in a proceeding under the Act 'is to determine whether the petitioner is entitled to a hearing." Airmers, 34 Ill.2d 22, 226, 215 N.E.2d 225. Therefore, the dismissal of a post-conviction petition is warranted only when the petition's allegation of fact-liberally construed in favor of the petitioner and in light of the original trial record-fail to make a substantial showing of imprisonment in violation of the state or federal constitution.

Wherefore, petitioner request that this court grant him an evidentiary hearing on his issues presented in his petition according to the post-conviction hearing act.

S/S [signature]

Subscribed and sworn to before me this 25th day of July 2000.

[signature]
NOTARY PUBLIC

"OFFICIAL SEAL"
SANDRA SCHWAB
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/8/2001

DECATUR POLICE SERVICES DIVISION
DECATUR, ILLINOIS

Report No. 94042817




# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley Date of This Report 04/26/94

Arrested

On this date, I went to the Macon County Jail to interview Charles Talley in reference this report. Upon arrival, I was met by Talley.

INTERVIEW OF: Charles Talley, B/M/27, of 1124 East Main.

I advised Talley I wanted to interview him regarding the death of his brother, James Talley. Charles advised me he really did not have any information since he had been in jail at the time of his brother's death. I asked Charles if James had any enemies or if he knew of anyone that was causing James problems? Charles stated that he was not aware of James having any problems with anyone. I asked Charles if James was in a gang? Charles stated he did not know if James was in a gang or not.

I advised Charles that the name "Cat Daddy" had surfaced as possibly being involved in this murder of James Talley. Charles then advised me that he had heard while in jail that "Cat Daddy" had possibly set James Talley up, however he was not certain of this information. Charles advised me he was getting out later on this date and hoped to hear some information regarding the death of his brother. I asked Charles what other family members I could speak to regarding this report? Charles advised me he had a sister identified as Lether Talley who lives at 723 West Packard, 428-0714. I was advised that Lether would have information as to other family members I might interview. The interview of Charles Talley was then terminated.

As I was leaving the Macon County Jail, I saw Lether Talley sitting in the jail lobby waiting for Charles Talley. Lether Talley was then escorted down to the police department to be interviewed regarding this report.

INTERVIEW OF: Lether Talley, B/F/35, of 723 West Packard, 428-0714.

Lether advised me that she had heard that "Cat Daddy" was responsible for the shooting death of her brother, James Talley. Lether stated that James and "Cat Daddy" were friends and that she had heard through the grapevine that some drugs had turned up missing from "Cat Daddy's" residence. Lether stated she heard that "Cat Daddy" believed that James Talley was responsible for the theft of these drugs and this was the reason that "Cat Daddy" had shot him. Lether stated she has no idea who the other individual at the scene of the crime was.

I asked Lether if James had been concerned recently about anyone possibly going to hurt him? Lether stated not that she was aware of. I then asked Lether if James was aware of had any knowledge in the death of Jerome

CONTINUED

Signed Michael A. Beck #106 ck
Investigating Officer

DECATUR POLICE SERVICES DIVISION
DECATUR, ILLINOIS

Report No. 94041217




# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley Date of This Report 04/28/94

Arrested

Page 2 -- INTERVIEW OF: Dan W. Blunt, W/M/42, of 1039 East William, 428-2983.

Blunt advised me on 04/24/94, he was sitting on his front porch when he heard 4 gunshots in succession. Blunt stated the shots came from a northeasterly direction and he immediately looked up, saw a B/M standing in the front yard of 1084 East William. ~~Blunt described the B/M as being approximately 5'8", wearing either a dark tee-shirt or a dark jacket.~~ Blunt stated the lighting was well enough that he was able to see the B/M was wearing something dark colored. Blunt also indicated this B/M had a thin build.

Blunt stated when he saw this B/M, the B/M was standing in the middle of the front yard at 1084 East William and appeared to be talking to either one or two black individuals standing in the doorway of 1084 East William. Blunt stated the B/M in the front yard then quickly walked to the west side of 1084 East William and then walked northbound between 1084 East William and the house directly west of that address. Blunt stated he did not see the B/M again.

Blunt stated he then went inside and called the police and indicated that shots had been fired. Blunt stated after speaking with the dispatcher, he came back outside and then walked down to the scene of the shooting. Blunt stated he approached an officer and advised him that he had called the police and had some information. Blunt stated he later was brought to headquarters where he was interviewed reference this report.

I then advised Blunt I wanted to show him some photos to see if he could make an identification. Blunt advised me he would look at the photos, however indicated he was approximately a half block away and did not feel he would be able to identify anyone. I then showed Blunt the below-listed photo lineup:

1. Joseph Hayes, photo taken 05/02/89.
2. Timothy Wayne Wilder, photo taken 10/12/88.
3. Orlando Allen, photo taken 05/31/89.
4. Percy Beiler, photo taken 03/28/91.
5. Kenneth Beasley, photo taken 09/22/93.

Blunt stated he did not recognize anyone in the photos, however pointed

CONTINUED

Signed Michael A. Beck #106 ck
Investigating Officer

PROSECUTION C28

DECATUR POLICE SERVICES DIVISION
DECATUR, ILLINOIS

Report No. 94041217

OFFENSE
Ex. C

# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley Date of This Report 05/12/94

Arrested

On this date, I was interviewing Tyrone Perry in reference to another report. I asked Perry if he had any information regarding the murder of James Talley? Perry advised me the only information he had heard was that the police were looking for an individual named "Whami". Perry stated he does not know this individual named "Whami".

Perry stated he was with his brother, Curtis Jones, and that they were talking to an individual he identified as "Lucky". Lucky's correct name is Marion Reed. "Lucky" advised both Tyrone Perry and Curtis Jones that he had been asking around who was responsible for killing James Talley? The reason "Lucky" was asking was he indicated he was a cousin to James Talley. "Lucky" stated to Perry and Jones that shortly after asking around about who was responsible for killing James Talley, "Cat Daddy" (Orlando Allen) saw "Lucky" and began shooting at him. "Lucky" indicated that he had a weapon himself and returned fire, however does not believe he hit "Cat Daddy". Perry stated he does not know where this shooting occurred, however indicated "Lucky" advised him that the shooting took place near a car lot and that "Lucky" had made arrangements with the owner of the lot to pay for a window which was broken out during the shoot out.

Signed Michael A. Beck #106 ck
Investigating Officer



PROSECUTION C-29

CASE HEADING Talley DATE 042794 REPORT # 94041217

THIS FORM IS TO BE UTILIZED BY THE PATROL DIVISION FOR HAND-PRINTED INFORMATION OR FOLLOW-UP REPORTS WHICH CAN BE COMPLETED IN THE SPACE ALLOWED ON ONE FORM.

This officer received information that a Marion S. Reed, b/m/20 (9-7-73), was with James Talley approximately 15-20 minutes before he was shot. Reed has not come forward because he is afraid of being shot, and he has a warrant on file against him. Only information on the shooter is a nickname, "catdaddy." Reed has a mother who lives @ 926 S. Franklin. Reed is a cousin to Talley. Reed works @ a car shop @ 426 N. Calhoun. He stays on Church street (in a large green building) somewhere north of King Street.

I later learned that "catdaddy" is Orlanda Allen of 1084 E. William. Also the address on Reed might be 876 N. Church.

REPORTING OFFICER Lipe

BADGE # 42 C-30

APPROVED BY [signature]

PROSECUTION

DECATUR POLICE SERVICES DIVISION

DECATUR, ILLINOIS

Report No. 94041217






# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley Date of This Report 04/25/94

Arrested

Page 2 -- INTERVIEW OF: Charles Talley.

Charles did give me the phone number of Leather, phone: 428-0714.

I asked Charles if he had any idea what had happened to James, or if he had heard any information as to what had happened? Charles stated that he had not heard anything, only that James had been shot 4 times. Charles stated that he had talked to his sister a little bit about this incident, and his sister didn't seem to know much information at this point either.

I advised Charles that I would be going back to his sister's home, or at the very least give her a call to find out if she does, in fact, know anything.

Reporting officer did make a phone call to Leather Talley, phone: 428-0714.

Upon calling that phone number, I did talk to a B/M subject who did not ID himself, however stated that he would get Leather Talley on the phone. I did speak with Leather Talley, and I did advise her who I was and where I was from. Leather began to cry, and stated that she had a lot of information that she needed to relay to me, but there were so many people at the house she was frightened to give this information out. Leather stated that there would be a B/F who would remain anonymous, who would give me some important information this evening. Reporting officer did speak with a B/F, this B/F stated that "Cat Daddy" was the subject who did kill James Talley. The B/F stated that "Cat Daddy" is now on the run, and she believes that he has either went to St. Louis or Chicago. The B/F stated that she has pertinent information, and this information should lead investigators to "Cat Daddy" and to find out exactly what had happened on the night that James Talley was killed.

This B/F stated that she would call me at approximately 2 o'clock tomorrow afternoon, and she would arrange for a place where we could meet, and she still wanted to stay totally anonymous. The B/F stated that she could not talk much longer, because there are many people at the house at this time, and she is afraid that the information she would give would be overheard by these subjects.

The B/F stated that she would call around 1 or 2 o'clock tomorrow afternoon and she would arrange for a place for me to meet her.

CONTINUED

Signed D.L. Montgomery #12 ck
Investigating Officer

C.31

PROSECUTION

Report No. 94041217

DECATUR POLICE SERVICES DIVISION

DECATUR, ILLINOIS




# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley

Date of This Report 04/25/94

Arrested

Page 3

I explained to the B/F that I do not come to work until 3 o'clock in the afternoon, and there is an investigator who is working this case who could meet with her. The B/F stated that she does not want to meet with anyone else, that she would meet with me, and she could wait until after 3 o'clock to make that phone call. The B/F stated that we would probably meet somewhere in the area of Hummingbird Drive, and she stated that it would actually be better for her to meet me after 3 o'clock tomorrow afternoon.

I asked the B/F if she was going to give me information which would positively point the finger to "Cat Daddy" as being the subject who did the shooting? The B/F stated that all of her information will point directly to "Cat Daddy", however the information that she is giving will not be positive proof at this point. The B/F stated that by tomorrow afternoon, she may have enough information which would positively link "Cat Daddy" to the shooting, and we could possibly even retrieve the gun which was involved in this shooting. Reporting officer did give the B/F my name, and she stated that she would be calling me after 3 o'clock tomorrow afternoon.

Signed D.L. Montgomery #12 ck

Investigating Officer

C-32

PROSECUTION

DECATUR POLICE SERVICES DIVISION

DECATUR, ILLINOIS

Report No. 94041217

OFFENSE Ex. F



# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley Date of This Report 05/29/94

Arrested

Page 4 -- INTERVIEW OF: Billy Hammer.

Later on this date, I received a Macon County Jail inmate request form from Torey Wilson stating he wanted to speak with me. I then went to the Macon County Jail to speak with Torey Wilson. Upon arrival, I was advised that Wilson was in Trod #1. I then went to Trod #1 and interviewed Torey Wilson.

INTERVIEW OF: Torey L. Wilson, B/M, of 355 North Illinois.

Torey L. Wilson read and was read the custodial interview advice form. He indicated an understanding of those rights, initialed and signed the form, and agreed to make a statement to this officer.

Wilson advised me he was currently in jail on an aggravated battery charge and was afraid he was going to go back to prison. Wilson stated he had some further information to tell me regarding the murder of James Talley. Wilson stated he was going to volunteer this information to me, however asked if I could give a good word for him to the State's Attorney in hopes that he would not be sent back to prison. I advised Wilson I could not make any promises. Wilson relayed the following information to me.

Wilson stated on the night of the homicide, 04/24/94, he was leaving his girlfriend's house who resides at 355 North Illinois. Wilson's girlfriend was identified as Asia Turner.

Wilson stated as he left Turner's residence, he was walking southbound on Illinois Street and had just left 355 North Illinois. Wilson stated as he was walking down the street, he saw 3 B/Males talking on the sidewalk north of the northwest corner of Illinois and William. Wilson stated he recognized one of the B/Males as James Talley and a second the B/Males as Orlando Allen, also known as "Cat Daddy".

Wilson stated as he was in the street, he saw Talley talking to the Unknown B/M who was standing with "Cat Daddy". Wilson stated Talley was moving his hands back and forth as if he was trying to explain something to this Unknown B/M. Wilson stated he does not believe Talley was arguing with this B/M, however stated if he was they were being very quiet because he could not hear what was being said. Wilson stated that Talley was talking with the Unknown B/M and that "Cat Daddy" was standing approximately 5 feet away from them. Wilson stated that the next thing he knew, the Unknown B/M

CONTINUED

Signed Michael A. Beck #106 ck
Investigating Officer

C-33

PROSECUTION

94041217

Report No.

DECATUR POLICE SERVICES DIVISION

DECATUR, ILLINOIS

OFFENSE

Ex. 6

# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley Date of This Report 05/29/94

Arrested

Page 5 -- INTERVIEW OF: Torey L. Wilson.

displayed a weapon and shot James Talley in the head. Wilson stated Talley fell to the ground at which time the Unknown B/M stepped back and shot Talley 3 more times in the body.

Wilson stated that "Cat Daddy" then ran to the west of his apartment and then south. Wilson stated the Unknown B/M that shot Talley ran westbound in the alley and Wilson indicated he ran eastbound in the same alley that the shooter ran westbound in. Wilson stated he ran to the laundromat and called 911 on the pay phone, however received a busy signal. Wilson stated he believed the police had been contacted because he heard sirens shortly thereafter. Wilson then went back to the scene and advised one of the officers present that he had seen the shooting occur and spoke with the officer. Wilson stated he did not advise the officers that "Cat Daddy" was one of the 3 B/Males he had seen.

Wilson stated on the following day, he spoke with "Cat Daddy" about what he had seen. Wilson stated the only thing "Cat Daddy" advised him was that Wilson should not "fuck with it".

I asked Wilson if he had any idea why this murder had occurred? Wilson stated that he had heard that "Paducah" (Anthony Hobson) had given some drugs to James Talley to sell. Wilson stated he heard that Talley and "Cat Daddy" had smoked up all the crack cocaine and that Talley was murdered because of this. I then asked Wilson if this was correct, why "Cat Daddy" had not also been killed? Wilson stated he heard that "Cat Daddy" had set James Talley up to be murdered and that he was not going to be killed.

I then showed Torey Wilson the same photo lineup that I had shown Billy Hammer. Wilson immediately identified #2 as Orlando Allen. Wilson then stated he recognized #3, James Delso, however did not know Delso's name, however did know him as "Whami". Wilson stated that he has seen Delso hanging around with "Paducah", however he cannot identify Delso as being the person that shot James Talley on the night Talley was murdered. Wilson stated he believes that James Delso could have something to do with the murder of James Talley, however stated he does not make that determination because of the photo lineup, rather than because of what he had heard with Talley ripping off Anthony Hobson and that Hobson and Delso are good friends.

I asked Wilson why he had not given this information to the police earlier? Wilson stated he had not given this information to the police because he was afraid of what would happen if he talked. I asked Wilson if

CONTINUED

Signed Michael A. Beck #106 ck
Investigating Officer

PROSECUTION C-34

DECATUR POLICE DEPARTMENT

DECATUR, ILLINOIS

Report No. 94041217




R2717d

# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley Date of This Report 050894

Page 2 of 3

INVESTIGATION

Orlando Allen was then escorted to the interview room in MSO intake to be interviewed regarding this report.

Interview of Orlando M. Allen - B/M - 32 - 1084 E. William - no phone

Allen was advised of his miranda rights by use of the custodial interview advice form. Allen read and was read the form, initialed and signed the form and agreed to speak with me.

Allen stated that he does go by the nickname of "catdaddy". Allen also stated that he was very good friends with James Talley. Talley used to visit with Allen frequently at Allen's apt.

Allen stated on the day of Talley's murder, Talley had been at Allen's house at approximately 1500 hrs. ALlen was not sure of the time Talley had come by, ALlen stated that Talley was drixing his Beige Ford Escort when he arrived. Talley, Etta Wiggins and Allen sat around the apt talking. Allen stated he believed that Etta Wiggins allowed Tally in the apt and was certain that Wiggins was present.

Allens tated approximately 30 minutes to 1 hour later that they went to Eldorado package liquor and purchased a 40 oz King Cobra and a pint of night train wine. Allen stated that he went with Talley to make this purchase before they returned to ALlen's residence. Allen stated that all three of them were drinking in the apt and that they ran out of alcohol so another xxxxx trip was made to Eldorado package liquor. Allen could not remember who made this trip nor could he remeber the time, but he stated it was still light outside. After drinkingg this alcohol, Talley stated that he had to leave, but that he would return later. ASlenx stated that Talley left, but he was unsure of the time. Allen stated it was getting dark when Talley left and that Talley left driving in his car.

Allen stated that at approximately 2130 houss James Talley returned. Allen again was unsure of the time. Allen stated that Talley came into his apt and went upstairs. Allen stated that he was laying down with Wiggins and that Talley stayed for approxiamtely 10-15 minutes talking with both Allen and Wiggins. Talley finally stated he was goning to leave and he did. Xllen stated he thought that Talley had left the area. Approximately 10 minutes later both Wiggins and Allen were still in bed watching tv when Allen heard gunshots. Allen turned off the tv and the lights and looked out the front window. Allen was unable to see anything. A short time later the polcie arrive so ALlen went outside. Allen stated he saw Talley on the ground and thht Talley was trying to get up off the sidewalk. Allen spoke to Talleybut got no seponse.

Signed Michael A. Beck #106

Investigating Officer

125

PROSECUTION

DECATUR POLICE DEPARTMENT

Report No. 94041217

DECATUR, ILLINOIS







# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley Date of This Report 05-08-94

Page 3 of 3

INVESTIGATION

Allen then went back in his apt was interview by police later on that date. Allen stated that he did not tell the police Talley had just left his apt because Wiggins advised officers of that fact. I advised Allen that this informtaion was not listed in any report.

I then xix asked Allen if he knew anyone by the nickname of 'whami'? Talley stated that he did not. I told Allen that I had recieved information that he was involved in this shooting. Allen stated there was a b/m named Terrence that is telling people that Allen is involved, but he does not know why. ALlen has no further information on Terrence and does not know how to get ahold of him.

ALlen again stated that he was good friends with Talley and would not do this or have Talley set up. I asked Allen if he would be willing to take a polygraph? Talley stated he would not since he is a nervous person. The interview with Allen was then terminated.

Etta Wiggins was then returned to the interview area so I could re-interview her regarding what ALlen had stated.

Re-interview of Etta Wiggins

Wiggins was advised of her rights by use of the custodial interview advise form . Wigginstated she understood her rights and agreed to speka with me.

I advised Wiggins that Allen told me that James Talley had been at Allen's apt along with Wiggins drinking earlier in the day and that he had jsut left the apt approximately 10 minutes before he was shot. Wiggins stated that Talley was not at Allens apt and that ALlen must be feferring to another day. Wiggins continued to deny that Talley had been at theapt so the interview was terminated

Signed michael A. Beck #106
Investigating Officer

C36

PROSECUTION

DECATUR POLICE DEPARTMENT

Report No. 94041217

DECATUR, ILLINOIS




# FOLLOW UP INVESTIGATION REPORT

Case Heading Talley Date of This Report 05-08-94

Page 1 of 3

INVESTIGATION

On this date, I went to the MSO jail to interview Etta J. Wiggins in reference this report. Upon arrival, Wiggins was interviewed in the intake area interview rooms.

Intervive of Etta J. Wiggins - B/F - 31 - 1075 E. William 422-8343

I advised Wiggins that the investigation of James Talley's murder was continuing and I needed to speak with her regarding this report. Wiggins relayed the following information.

Wiggins stated that she currently resides at 1075 E. William. Wiggins boyfriend is ORlando Allen and Allen resides at 1084 E. William. No one lives with Allen, but Wiggins occasionally spends the night with him. Wiggins stated that she is 5 months pregnant and that Allen is the father. Wiggins and ALlen have been dating for 2½ years.

Wiggins stated on the day Talley was killed that she had not been feeling well and had laid around most of the day. Wiggins stated that there had been no one at the house and that she and Allen were upstairs in bed watching TV. Wiggins believed that the news was on TV, but she is not sure.

Wiggins stated she went to sleep, but was awakened by the sound of gunshots. Wiggins did not get out of bed and neither did Allen. Both stayed where they were and did not look out the window. Once Wiggins could see red lights flashing from police cars Allen looked out the upstairs window. Allen and Wiggins then went downstairs. Both were interviewed by police after they had gone downstairs.

Wiggins stated that she knew James Talley and that Tallye had not been by the house on that date. Wiggins also denied any gang affiliation and stated she did not know if Allen was a gang member or not.

Wiggins stated that as far as she knows that Allen was home all night. Since Wiggins was not feeling well she did sleep some on that date. Wiggins stated that Allen might have left whele she took a nap, but stated he could not have been gone to long if he did leave..

Wiggins stated that she knows no one by the nickname of 'whammi'. Wiggins also stated that Allen has not mentioned the murder of James Tally and stated that if allen is involeved she has no knowledge of it. Wiggins stated that if she is not home she can be reached at her mother's address of 854 E. William phone 422-8423. Wiggins mother was id'd as Almata McClenton.

Signed Michael A. Beck #106

Investigating Officer

PROSECUTION C-37



CX. K

Q That's here in Macon County, correct?

A Yes.

Q And at that address, he was living in an apartment at that house?

A Yes.

Q Do you remember which apartment?

A Upstairs apartment.

THE COURT: Just pull the microphone a little bit closer. You are talking fairly low, ma'am.

Q (By Mr. Rueter) Were there just upstairs and downstairs apartments?

A Yes.

Q Or more than that, if you recall?

A Yes.

Q Just upstairs and downstairs?

A Uh-huh. (affirmative)

Q That is on the corner basically of Illinois and William; is that correct?

A Yes.

Q Now, do you recall what time you first went to that apartment that day?

A Around three.

Q Three in the afternoon?

A Uh-huh. (affirmative)