No. 5-04-0035

# IN THE APPELLATE COURT OF ILLINOIS

# FIFTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) ) ) | Appeal from the Circuit Court of the Twentieth Judicial Circuit, |
| Plaintiff-Appellee, | ) | St. Clair County, Illinois. |
| | ) | |
| -vs- | ) | No. 99-CF-825 |
| | ) | |
| **DELANDUS BEST,** | ) | Honorable |
| Defendant-Appellant. | ) | Richard Aguirre, |
| | ) | Judge Presiding. |
| | ) | |
| | ) | |

RECEIVED
APR 18 2005
S. A. A. P. 5th DIST.

# REPLY BRIEF AND ARGUMENT

# FOR

# DEFENDANT-APPELLANT

**DANIEL M. KIRWAN**
Deputy Defender

Office of the State Appellate Defender
Fifth Judicial District
730 E. Illinois Highway 15, Suite #1
Mt. Vernon, IL 62864
618-244-3466

COUNSEL FOR DEFENDANT-APPELLANT

**ORAL ARGUMENT REQUESTED**

EXHIBIT H

## POINT AND ADDITIONAL AUTHORITIES

BEST'S POST-CONVICTION COUNSEL DID NOT PROVIDE BEST REASONABLE ASSISTANCE, WHERE HE URGED THAT TRIAL COUNSEL WAS INEFFECTIVE FOR NOT HAVING HAD CRITICAL EVIDENCE SUBJECTED TO INDEPENDENT SCIENTIFIC TESTING, BUT DID NOT HIMSELF SECURE SUCH TESTING, TO SHOW HOW BEST WAS PREJUDICED BY HIS TRIAL COUNSEL'S ALLEGED SHORTCOMING ..................................................................................................... 2

*People v. Moore*, 189 Ill. 2d 521,
727 N.E.2d 348 (2000) ....................................................................................... 2

*People v. Williams*, 186 Ill. 2d 55,
708 N.E.2d 1152 (1999) ..................................................................................... 2

*People v. Sargent*, ___ Ill. App. 3d ___,
___ N.E.2d ___ (1st Dist. No. 1-03-2096, Sept. 30, 2004) .................................... 4,5

*People v. Gandy*, 341 Ill. App. 3d 474,
792 N.E.2d 814 (5th Dist. 2003) ..................................................................... 3,4,5

# ARGUMENT

BEST'S POST-CONVICTION COUNSEL DID NOT PROVIDE BEST REASONABLE ASSISTANCE, WHERE HE URGED THAT TRIAL COUNSEL WAS INEFFECTIVE FOR NOT HAVING HAD CRITICAL EVIDENCE SUBJECTED TO INDEPENDENT SCIENTIFIC TESTING, BUT DID NOT HIMSELF SECURE SUCH TESTING, TO SHOW HOW BEST WAS PREJUDICED BY HIS TRIAL COUNSEL'S ALLEGED SHORTCOMING.

Citing *People v. Williams*, 186 Ill. 2d 55, 708 N.E.2d 1152 (1999), *People v. Johnson*, 154 Ill. 2d 227, 609 N.E.2d 304 (1993), and *People v. Moore*, 189 Ill. 2d 521, 727 N.E.2d 348 (2000), the prosecution urges that it was Best's duty to "provide[] post-conviction counsel with information advising that an expert who would have challenged the State's findings actually existed." (State's brief at 12-13) The prosecution misapplies these cases. In each of these cases, the defendant raised claim(s) in his *pro se* petition, in a general or incomplete fashion, and his counsel included them in an amended petition, without supporting the claim(s) with affidavits. *Williams*, 186 Ill. 2d at 59, 61-62, 708 N.E.2d at 1154-55; *Johnson*, 154 Ill. 2d at 247-48, 609 N.E.2d at 313-14; *Moore*, 189 Ill. 2d at 540, 542-43, 727 N.E.2d at 358-60[1]. In each case, the Supreme Court ruled that the defendant was obligated to give

---

[1] The Supreme Court did not clearly state whether the claim that appointed counsel in *Moore* did not investigate and develop (*i.e.*, regarding the hair and fingerprint evidence) was first raised by Moore in his *pro se* petition, or instead by counsel in an amended petition. However, material obtained from the Grundy County Circuit Clerk, and submitted to This Court with a motion asking the Court to judicially notice it, clearly establishes that, as in *Johnson* and *Williams*, the claim was first presented by the defendant in his *pro se* petition. (Appendix A,

the attorney appointed to represent him on the petition, information regarding the existence of information and material that supported the claim(s).

By contrast, the issue of Best's trial counsel's ineffectiveness for not having the ski masks and other materials tested was not introduced by Best in his *pro se* post-conviction petition (R.C173-98), but instead by Best's post-conviction counsel, in the amended petition counsel prepared (R.C226). It would be incongruous for counsel to identify and present a claim, and for the burden of properly developing and supporting it to fall on his client. Understandably, the prosecution cites no case that places the burden on the defendant in such a situation.

Next, the prosecution urges that Best should fail before This Court because he cannot show that he was prejudiced by his post-conviction counsel's failure to secure testing of the mask and related materials. (State's brief at 14-15) The prosecution's argument is similar to that which it raised, and This Court rejected, in *People v. Gandy*, 341 Ill. App. 3d 474, 792 N.E.2d 814 (5th Dist. 2003). Gandy filed a *pro se* post-conviction petition, and counsel was appointed to represent him. Counsel obtained an extension of time to file an amended petition, representing to the court that, in interviewing Gandy, Gandy had "'raised numerous issues which require more investigation before counsel will be in a position to file any necessary amendments.'" *Gandy*, 341 Ill. App. 3d at 477, 792 N.E.2d at 816-17. Thereafter, counsel informed the court that he would be filing an amended petition, and then obtained a second extension of time to do so, because, according to counsel, "'After further conversations with the Defendant, counsel has learned that the Defendant has a

---

C924)

-3-

substantial amount [sic] of issues other than *Apprendi*.'" *Id.* at 478, 792 N.E.2d at 817. The prosecution filed a motion to dismiss Gandy's petition; counsel did not respond to the motion or file an amended post-conviction petition; and the court granted the motion to dismiss.

On appeal, Gandy contended that he had not received reasonable assistance from his post-conviction attorney, because the record did not show that counsel amended Gandy's *pro se* petition for an adequate presentation of his claims. The prosecution replied that Gandy had not shown that the issues in his petition which his post-conviction counsel had identified "'could have been amended to state [a] case upon which relief could be granted.'" This Court quickly put the prosecution's argument to rest — "The State's argument begs the question because it is not a matter of record what transpired during McHaney's [post-conviction counsel] conversations with defendant" — and reversed the order dismissing Gandy's petition. *Id.* at 479, 792 N.E.2d at 818.

Furthermore, in *Johnson*, where counsel also had not yet performed his duties under Rule 651(c) by properly developing some of the defendant's claims, the Supreme Court did not even suggest that it could engage in a harm analysis in the course of deciding the issue. Rather, the Court reversed the dismissal of the post-conviction petition, and remanded the cause to the circuit court for counsel to try to obtain evidentiary support for the claims.

*People v. Sargent*, ___ Ill. App. 3d ___, ___ N.E.2d ___ (1st Dist. No. 1-03-2096, Sept. 30, 2004), presents an example of when a reviewing court can properly conclude that the post-conviction petitioner was not harmed by his attorney's failure

-4-

to meet his Rule 651(c) obligations. The defendant in *Sargent* filed pro se a post-conviction petition, and counsel was appointed to represent him. The petition presented a single claim, an error of law. The claim had no substantive merit because of a prior decision of the Illinois Supreme Court. Thus, regardless of how counsel amended the claim, regardless of how much of the record of the trial proceedings counsel examined, and regardless of how much counsel consulted with the defendant about the claim, the claim was doomed. Clearly the defendant in *Sargent* was not harmed by his attorney's noncompliance with Rule 651(c).

Best's situation is much more like those in *Johnson* and *Gandy* than the one in *Sargent*. Best's counsel stated that trial counsel was ineffective for not getting the hair and DNA evidence tested. Post-conviction counsel thereby implied that he could show that, had trial counsel submitted the material for testing, favorable results could have been obtained, and consequently Best's trial might have turned out differently. *See People v. Albanese*, 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255 (1984) (To succeed on a claim of ineffective assistance of counsel, the defendant must establish "'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'"). Obviously, this claim is based in fact. Since counsel has yet to properly investigate, develop and present the relevant facts, what facts are out there and available to counsel are unknown, and thus it would be premature to conclude at this time that Best cannot succeed.

# CONCLUSION

Because Best's post-conviction counsel did not provide Best reasonable assistance in advancing the claim that Best's trial counsel was ineffective for not having had critical evidence subjected to independent scientific testing, Best requests that This Court reverse the order denying him post-conviction relief, and remand the cause for further proceedings.

Respectfully submitted,

DANIEL M. KIRWAN
Deputy Defender
Office of the State Appellate Defender
Fifth Judicial District
730 E. Illinois Highway 15, Suite #1
Mt. Vernon, IL 62864
618-244-3466

COUNSEL FOR DEFENDANT-APPELLANT

# APPENDIX A

IN THE

CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT

GRUNDY COUNTY, ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Grundy County No. 91-CF-54 |
|     Respondent | ) ) | |
|     vs. | ) ) | |
| EDWARD A. MOORE, JR., | ) ) | Honorable Robert H. Adcock |
|     Petitioner. | ) | Judge Presiding. |

**FILED**

JUL 3 1995

*Lee Marie Bell*
GRUNDY COUNTY CIRCUIT CLERK

<u>PRO SE PETITION FOR POST-CONVICTION RELIEF IN CAPITAL CASE
AND MOTION FOR APPOINTMENT OF COUNSEL</u>

EDWARD A. MOORE, JR.
Reg. No. A-70777
Box 711
Menard, IL 62259

C- 900

## CONTENTS

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . .    1

VERIFICATION AND PAUPER'S AFFIDAVIT  . . . . . . . . . . .    2

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . .    3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . .    5

POST-CONVICTION CLAIMS . . . . . . . . . . . . . . . . .   23

MOTION FOR APPOINTMENT OF COUNSEL  . . . . . . . . . . .   35

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . .   36

APPENDICES . . . . . . . . . . . . . . . . . . . . . .  A-E

-i-

C· 931

## PRO SE PETITION FOR POST-CONVICTION RELIEF IN CAPITAL CASE
## AND MOTION FOR APPOINTMENT OF COUNSEL

Now comes the Petitioner, EDWARD A. MOORE, JR., _pro se_, and respectfully petitions this court for post-conviction relief pursuant to 725 ILCS 5/122. Specifically, the Petitioner seeks the following relief: (1) a hearing on this petition; (2) a new trial; and, (3) a new capital sentencing hearing. In addition, pursuant to 725 ILCS 5/122-2.1(a)(1), Petitioner requests that counsel be appointed to represent him in this matter.

C·902

## VERIFICATION AND PAUPER'S AFFIDAVIT

EDWARD A. MOORE, JR., after being sworn under oath, states that the contents of the foregoing post-conviction petition are true and accurate. He further states that he is without sufficient funds to procure counsel to represent him in these proceedings.

Edward A. Moore, Jr.
Reg. No. A-70777
Box 711
Menard, IL  62259

Subscribed and Sworn to
before me on this 28th day
of June, 1995.

Notary Public

OFFICIAL SEAL
**SHEILA ANN HUSTAVA**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12-17-98

-2-

C· 903

## PROCEDURAL HISTORY

On August 2, 1991, the Petitioner was charged by indictment in the Circuit Court of Grundy County with the first degree murder, home invasion, residential burglary, aggravated criminal sexual assault, robbery and arson in connection with the death of Judy Zeman on July 7, 1991. On June 9, 1992, a jury convicted Petitioner on all counts. The matter proceeded to a capital sentencing hearing, where the jury found Petitioner eligible for the death penalty under Ill.Rev.Stat., 1992, Ch. 38, §9-1(b)(6), that Mrs. Zeman was killed in the course of several enumerated felonies. After considering mitigating and aggravating factors, the jury sentenced Petitioner to death.

Petitioner's direct appeal of his convictions and death sentence is pending under Illinois Supreme Court No. 75813. Appellate counsel, Timothy M. Gabrielsen, of the Office of the State Appellate Defender, Supreme Court Unit, Springfield, Illinois, argued Petitioner's case before the Illinois Supreme Court on March 15, 1995. No opinion has yet been filed by the court.

The filing of this Petition even before the direct appeal has been decided is due to the change in the law, which, beginning on July 1, 1995, requires that a Post-Conviction Petition be filed within three years of the imposition of the death penalty or within six months of the denial by the United States Supreme Court of a Petition for Writ of Certiorari, whichever is sooner. As Petitioner's direct appeal is pending and Petitioner has not had reason to file a Petition for Writ of Ceriorari, Petitioner is compelled to file his Post-Conviction by July 1, 1995.

C · 994

Petitioner's claims of constitutional deprivation follow and are accompanied by an appendix that contains evidentiary support for such claims.   Petitioner asks that this court take judicial notice of the report of proceedings and common law record in <u>People v. Moore</u>, Grundy County No. 91-CF-54.

C. 905

## STATEMENT OF FACTS

On August 2, 1991, a twelve-count indictment was filed in Grundy County that charged Edward A. Moore, Jr., with seven counts of first degree murder, home invasion, residential burglary, aggravated criminal sexual assault, robbery and arson, in connection with the death of Judy Zeman on July 7, 1991. (C. 28-39) All page citations are to the common law record or the report of proceedings in this case.

### Pretrial Motions

Mr. Moore moved on February 3, 1992, to admit statements made by Mrs. Zeman to the effect that she did not know who had attacked her, such statements having been made in the hours before her death. (C. 199-202) That motion alleged that the statements were made to a Grundy County Sheriff's deputy and to personnel at the Morris Community Hospital. Between February 29, 1992, and March 10, 1992, the trial court heard testimony from 22 witnesses on the motion to admit statements. On March 30, 1992, the trial court ruled that the statements were admissible as excited utterances. (R. 160-722)

The defendant moved on May 15, 1992, to bar the results of DNA testing that had been performed on various items of evidence obtained by law enforcement personnel and blood samples taken from Mr. Moore. (C. 341) At a hearing on May 18, 1992, defense counsel requested a _Frye_ hearing in order to prove that DNA testing is not accepted in the scientific community. (R. 739) The court denied the request for a _Frye_ hearing and the motion to exclude the DNA results. (R. 741, 757)

C·995

## Trial

Dennis Hackett testified to having resided on Sawmill Lane in Morris, Illinois, on July 7, 1991. (R. 1383) At 5 a.m. on that date, he noticed a car in his front yard against a tree. Headlights were on and hazzard lights were flashing. Hackett called the Grundy County Sheriff's Department. Deputy Lonnie Harvey arrived at Hackett's residence at 5:22 a.m. and ascertained that the black over red Cadillac Allante was registered to the Zemans who lived on nearby Pioneer Road. (R. 1399) The vehicle was running, and the gear selector was in drive. Harvey was informed that there was no response at the Zeman residence. (R. 1402)

Upon arriving at the Zeman residence, Harvey noticed a large woodpile burning and saw an unclothed burn victim, who identified herself as Judy Zeman, laying on the driveway. (R. 1407) Zeman told Harvey that she had been raped and set on fire, and that she did not know who had done this to her. (R. 1409, 3177) Zeman had duct tape on her wrists and hair. (R. 1413) Zeman told Harvey that she was awakened by her dog barking at 2:30 a.m. A man wearing dark clothes, dark tennis shoes, and gloves, and bearing a knife, sex-ually assaulted her in her bedroom, took some money and jewelry from the house, took her outside, poured gas on her and lit her on fire. The man kicked her a few times. She crawled to the driveway. On cross-examination, Harvey again testified that Zeman did not know who had done this to her. (R. 1415-16)

Grundy County Sheriff's Department Detective Kevin Callahan arrived at the Zeman residence after Deputy Harvey and that he conversed briefly with Zeman. (R. 1423, 1426) Zeman told Callahan that she had been raped and that her assailant wore gloves. A

-6-

C · 917

paramedic, Jeanne Sheppard, arrived at the Zeman residence shortly before 6 a.m. on July 7, 1991, and noticed Judy Zeman on the driveway.  (R. 1797)  Zeman told Sheppard that she had been assaulted and that her assailant poured gasoline on her and set her on fire.  Sheppard took Zeman to the hospital in Morris.  Sheppard noticed blood over Zeman's left ear.  (R. 1801)

Emergency room nurse Patty Orton-Williamson testified to having treated Judy Zeman.  (R. 1818)  Although most of her body was burned black, Zeman had no burns across a two-inch wide band over her eyes and on the top of one foot.  Orton-Williamson further testified that Zeman stated that her assailant had raped and beaten her, poured gas on her and set her on fire.  (R. 1820)  Orton-Williamson heard someone ask Zeman who "did this to her."  (R. 1862)  Orton-Williamson testified that she did not remember Zeman's response.  She testified that whatever she told Detective Joseph Elens during an interview on July 9, 1991, would have been accurate as to what Zeman had said.  Detective Elens later testified that Orton-Williamson told him that Zeman stated that she did not know who did this to her.  (R. 3018)

Duct tape, contained in an envelope marked People's Exhibit No. 2, was removed from Zeman's wrists by Williamson and an EMT.  (R. 1826, 1828)  Grundy County Sheriff's Department Chief Deputy Terry Marketti testified to having been present when the duct tape was removed from Zeman's head and wrists.  (R. 2741)  He directed Williamson to remove additional duct tape, People's Exhibit No. 1, from the head of Zeman.  (R. 1829, 2741)  Marketti testified that it appeared to him as though the duct tape were across Zeman's eyes because of the white pattern across her eyes.  (R. 2746)

-7-

C · 018

Dr. Pedro Peralta, the emergency room physician, testified that Zeman was conscious but in shock when she arrived at Morris Hospital at 6:11 a.m. on July 7, 1991. (R. 1686) Zeman spent 40 minutes there and was flown to Loyola Medical Center. (R. 1688) Dr. Peralta heard Williamson ask Zeman who had done this to her. (R. 1694) Although Dr. Peralta testified that he did not hear the response, Detective Jeffrey Black later testified that Peralta told him on July 10th that he heard Zeman respond to Williamson that she did not know who did this to her. (R. 3134)

Morris Hospital X-ray technician Kathy Anderson testified that Zeman stated that it was dark at the time she was assaulted and she could not see who did it to her. (R. 1704) Nurse anesthetist Terry Donahue testified to having anesthetized Zeman and having intubated her to enable her to breathe. (R. 1663) Zeman told Donahue that her assailant lit her on fire after attacking her and after Zeman refused his order to kneel or lay behind the exhaust pipe of her automobile. (R. 1665) Donahue noted that Zeman's eyebrows were intact and that she had duct tape in her hair. (R. 1676) Nurse Nel West testified to having heard Judy Zeman state that she was raped, robbed, asked to bend over, refused to do so and was set on fire. (R. 1730)

For medical reasons, cardiopulmonary technician Deborah Esler could not testify. (R. 2106) The transcript of her testimony from the earlier hearing on the defense motion to admit Judy Zeman's statements was stipulated into evidence. (R. 2493) In that stipulation, Esler testified that Judy Zeman told her that a burglar broke into her house, robbed and raped her, and tried to tie her to the back of her car. (R. 2496) When Zeman fought, her

-8-

C: 019

assailant dragged her back into the house beat her, poured gas on her and set her on fire. Esler first testified that Zeman did not say that she had never seen that person before. (R. 2497) Esler admitted telling Detective Black on July 9, 1991, that Zeman did say that she had not seen her assailant before. (R. 2498) Esler then repeatedly testified that Zeman told her that she had not seen her assailant before. (R. 2499, 2500, 2503) Esler testified that Zeman's eyes were the only part of her body not burned and that there was duct tape in Zeman's hair. (R. 2501)

Nurse Jennifer Jorgensen admitted Judy Zeman at Loyola on July 7th. (R. 1762) Nurse Laura Kolassa testified that Zeman died at Loyola at 8:43 p.m. on July 7th. (R. 1769) Resident physician Mary McComis testified to having taken vaginal and and cervical swabs from Zeman to test for a sexual assault. (R. 1503) Those swabs were made a part of People's Exhibit No. 25, which was a box that also included hair combings, blood and saliva specimens, and fingernail swabs. (R. 1765-66) Dr. Edmond Donoghue testified to having performed an autopsy on Zeman on July 8, 1991. (R. 2554) He determined the cause of death to be thermal burns. (R. 2563) He also noted other injuries to Zeman, including bruises to her upper back, bruises to her vagina consistent with a sexual assault, bruises to her scalp consistent with blunt trauma, and a cut to the tongue consistent with having been struck in the jaw and having bitten her tongue. (R. 2557-58) There were no defensive wounds and Zeman was not stabbed. (R. 2584)

Crime scene technician Mel Trojanowski gave People's Exhibits Nos. 1 & 2, the fragments of duct tape taken from the body of Judy Zeman, to forensic scientist Michael Murphy. (R. 2918) Trojanow-

ski also gave Murphy People's Exhibit No. 22, the keyring found in Zeman's Cadillac. (R. 2921, 1544) The keyring bore two keys and a tag. Murphy found that one fingerprint on the key tag and one fingerprint on the adhesive side of the duct tape removed from the head of Judy Zeman were made by the person who made the prints on the known fingerprint standard of Ed Moore. (R. 2923) Trojanowski also found duct tape on the ground near the woodpile where Judy Zeman was first found. (R. 1479-82)

Grundy County Sheriff's Deputy Richard Close testified to having found a pink business card on the driveway of the Bruce Barr residence, a new house being built just to the east of Hackett's driveway, where Judy Zeman's Cadillac was left against the tree. (R. 1488) The business card bore the name of Ed Moore and E & M Painting. (R. 1493) Steve Taylor, a print shop owner, identified a box of business cards that he prepared for "E & M Painting Ed Moore." (R. 1956) Those cards left his shop on June 26, 1991. Grundy County Sheriff's Detective Mark Smyk obtained the box of business cards, which bore the inscription "E & M Painting" and Ed Moore's name at Moore's apartment during execution of a search warrant on July 15, 1991. (R. 1870-71)

Bruce Barr testified that he was present at his construction site on July 6, 1991, and that he and other workers picked up debris in the area before leaving at 8 p.m. (R. 1780-81) Barr did not see People's Exhibit No. 60, Moore's pink business card, on the ground at that time. Barr had seen Moore at his construction site soliciting painting work approximately three times before July 7, 1991. (R. 1783) Barr denied that he and Ed Moore had ever negotiated a price for the work that Moore would do for Barr. (R.

1789)  Detective Joseph Elens and Investigator Jeffrey Black later testified that Barr told them that Barr left the construction site at 5 p.m. rather than 8 p.m. on July 6, 1991.  (R. 3013, 3136) Barr also told Elens that he and Moore did settle on a price for Moore's painting the interior of Barr's new residence.  (R. 3015) Black saw other debris on the ground at the construction site on July 7, 1991.  (R. 3140)

George Dabdoub, a forensic scientist, testified that debris taken from the area of the woodpile where Zeman was found contained gasoline and that liquid found in a gas can at the Zeman residence, was gasoline.  (R. 1908, 1510)  Carl Zeman, Judy Zeman's husband, testified to the presence of several gasoline cans on the premises. (R. 1236)

On July 15, 1991, Grundy County Sheriff's Deputy Joseph Elens and Illinois State Police Sergeant Ken Kaupas searched a 1978 Buick at 4149 Elm Street, Downers Grove.  (R. 2438, 2444)  Sgt. Kaupas testified to having removed People's Exhibit No. 44, an automotive carpet, from that vehicle and delivering it to the state crime lab in Joliet.  (R. 2445)  Forensic scientist Ralph Meyer testified to having found two hairs on the mat that were consistent with the known head hairs of Judy Zeman.  (R. 2642)  Meyer also found on People's Exhibit No. 44 one hair that was consistent with the known head hairs of Ed Moore that showed signs of extreme heat damage. (R. 2645)  Meyer testified that such damage would be done by exposure to an open flame rather than merely being exposed to sunlight while lying in an automobile.  (R. 2646)  Deputy Elens found two pink "E & M Painting" business cards in the Buick.  (R. 2439)  Grundy County Sheriff's Detective Mark Smyk testified to

-11-

C·012

having recovered 444 pink "E & M Painting" business cards at Ed Moore's apartment in Morris during execution of a search warrant there on July 15, 1991.  (R. 1870-71, 1878)

Ralph Meyer further testified that head and pubic hairs were found on bedding and underclothing of Zeman found in the bedroom of the Zeman residence where Zeman claimed to have been sexually assaulted, but that none of the hairs found on those items to have belonged to Ed Moore.  (R. 2621, 2631-32)  Serologist Arlene Hall testified that vaginal swabs taken from Judy Zeman contained seminal material of a blood type consistent with Ed Moore.  (R. 2695)  Hall sent the vaginal swabs and known blood standards of Zeman and Ed Moore to the FBI, where DNA testing was performed by Robert Coffin.  (R. 2833)

Prior to Coffin's testimony, the defense again moved unsuccessfully to exclude the DNA testimony on grounds that there was no acceptable scientific basis for its admission into evidence.  (R. 2777, 2820)  Coffin then testified to having tested the known blood standards of Ed Moore and Judy Zeman, and the vaginal swabs submitted by the state crime lab.  (R. 2834)  Coffin's DNA profiling in this case involved the use of four probes, two of which showed a "match" between Ed Moore's blood and the blood on the vaginal swab taken from Judy Zeman.  (R. 2836, 2839, 2840, 2842)  Coffin's visual determination was corroborated by a computer.  (R. 2845)  Coffin testified that the odds of the two probes "matching" as they did here would be 1 in 466 of the Caucasian population.  (R. 2848)

Medical lab scientist Pravatchai Boonlayangoor testified for the defense that a minimum of four probes must "match" in order to

-12-

C.913

make an accurate identification and that other reputable labs require more than four probes before they declare a "match." (R. 3062, 3066-67) Dr. Boonlayangoor further testified that the DNA testing profile developed and used by the FBI in this case was insufficiently accurate to identify a perpetrator. Boonlayangoor also testified that there was no clear-cut "match" on the second probe, dropping the probability from 1 in 466 to 1 in 48 of the Caucasian population, which is too low an odd for the DNA identification to be valid. (R. 3078)

Carl Zeman testified that Ed Moore painted portions of his house between April and June, 1991. (R. 1222-23) Zeman sometimes paid Moore in cash from the safe in the master bedroom of his home. (R. 1228) Prior to leaving on his Alaska fishing trip on July 2, 1991, $7,000 to $10,000 in cash, jewelry, and various papers were in the safe. (R. 1235) The contents of the safe were missing when Zeman returned home from Alaska upon learning of the assault on his wife. (R. 1240) Zeman and Mel Trojanowski testified that a patio door showed sign of forced entry. (R.1238, 1513)

Grundy County Sheriff Jim Olson testified that he coordinated the investigation. (R. 1270) Over defense objection, he testified that he ordered his subordinates to find subcontractors who worked on the Zeman residence and that he was informed that Ed Moore could not be found. (R. 1286-92)

Kenneth Hittner testified that he owned the China Emerald Restaurant in Westmont, and that Ed Moore arrived at the restaurant after 3 p.m. on July 6, 1991. (R. 1329) Moore was there until dusk on that date. Shirley Sticken, the manager of the Camelot Arms Apartments in Morris, testified that between 8 p.m. and 9 p.m.

-13-

C. 914

on July 6th, Ed Moore, a resident there, came to her door and spoke with her.  (R. 1945)  Later that evening, Betsy Matteson and Sue Kuloff saw Ed Moore at Cuzin's Bar in Morris.  (R. 1352, 1357) Moore stayed at Cuzin's until sometime between 12:30 a.m. and 12:55 a.m.  Robert Brooks testified that his girlfriend lived in apartment #19 at the Camelot Arms Apartments on July 6, 1991, and that Ed Moore knocked on the door at 1 a.m. asking for beer.  (R. 1366)  Illinois Bell Security Manager Larry Renfro testified that 9:07 p.m. on July 6, 1991, a phone call was made between the phone number at Ed Moore's apartment and a number the parties later stipulated belonged to the Zeman residence.  (R. 1748, 2897)

Joanne Davis-Marugg, an American Airlines ticket agent, testified that Ed Moore approached her at O'Hare Field on July 7, 1991.  (R. 2336)  Moore was listed as having booked a flight in the name of a Mr. and Mrs. Peterson, but changed that booking to reflect that he would be traveling alone.  When Moore paid cash and had no luggage or identification, the American computer listed him as a hijacking risk.  The agent would not issue him his ticket. Moore told Davis-Marugg his real name and said that a friend had booked the flight for him.  Davis-Marugg voided his original ticket and issued one to Moore in his name.  (R. 2340)

Robert Connors, an airline security agent, testified to a business record that reflected the transactions performed by Ed Moore that morning.  (R. 2318)  Connors testified that the record indicated that Moore reserved a flight from Chicago to Nashville to Tampa at 6:30 a.m. on July 7, 1991, in the name of Ken and Kathy Peterson.  (R. 2323)  At 9:50 a.m., Kathy Peterson was deleted from that flight by Davis-Marugg at O'Hare Field, and a ticket was

issued for Ken Peterson. At 9:56 a.m., a ticket was issued for Ed Moore, and at 10:02 a.m. the ticket for Ken Peterson was canceled. (R. 2326)  The record indicated that the flight from Nashville to Tampa was changed due to the plane being late, and that a ticket was reserved for a flight to Atlanta and then on to Tampa.  Connors testified that his records did not show that Moore actually arrived in Florida.  (R. 2333)

Debbie Durham, a Marriott Hotel clerk in Tampa, testified to having checked Moore into the hotel on July 7, 1991, and out on July 8, 1991.  (R. 2350-52)  John Luescher, a motel clerk in Indian Rocks Beach, Florida, testified to having checked Moore into his motel on July 8, 1991.  (R. 2666)

Pam Elliott testified to having met Ed Moore at the Beach Place Bar in Indian Rocks Beach, Florida, on July 9, 1991.  (R. 2359)  Hopkins was a bouncer at the bar.  Elliott testified that Moore attempted to sell her a pearl ring and a gold ring with one diamond.  She indentified People's Exhibit No. 230 as a photo of the pearl ring.  (R. 2362)  Hopkins testified that he took Moore to see Elliott on July 8th and that Moore was selling two rings.  (R. 2423)    Pinellas County Sheriff's Detective Patricia Juhl later testified that Hopkins told her that he never saw Moore with jewelry or large amounts of money.  (R. 2996)  Hopkins testified that when he saw Moore two weeks later, his hair was shorter and he had a new tatoo.  (R. 2424)

Kathy Domanico testified that Ed Moore attempted to sell her two rings in a bar in Pinellas County, Florida, on July 20, 1991. (R. 2400, 2402)  She identified People's Exhibit No. 231 as a photo of one of the rings that Moore attempted to sell her.  Domanico

-15-

C . 923

testified that Moore had driver's licenses in his own name and in the name of an attorney, Tom Winters.  Kathy Zeman, the daughter of Carl and Judy Zeman, identified People's Exhibit Nos. 230 - 232 as photos of her mother wearing a pearl ring, a topaz ring and a diamond wedding ring.  (R. 2763-64)

Pinellas County Detective Robert Gualtieri encountered Moore as part of a narcotics interdiction program in July, 1991.  (R. 2380)  Moore registered at Howard Johnson's Hotel in Clearwater, Florida, under the name Ken Pontello.  Gualtieri observed Moore travel frequently by taxi, use public pay phones and move about the hotel parking lot.  (R. 2383-84)  Gualtieri was present when Sergeant Brian Anderson of the Pinellas County Sheriff's Department stopped Moore at a pay phone.  Moore gave his name as Keith Moore and could not explain why he had registered as Ken Pontello.  He had a check in his possession for $1,000 or $2,000.  Moore gave the officers a Phoenix address that did not exist, and inaccurately stated the social security number that appeared on the Arizona driver's license of Ken Pontello.  (R. 2387-88, 2508)  Anderson testified that, upon leaving, Moore left a blue bag behind that contained $965 in cash.  (R. 2506)

Ray Dittmar, a Florida cab driver, testified to having picked up a fare named "Tom" on July 23, 1991.  (R. 2471)  Dittmar identified Ed Moore as "Tom."  Dittmar took Moore to a motel where he registered Moore under Dittmar's name because Moore had no indentification.  Dittmar testified that when he saw Moore on July 23rd, Moore's hair and mustache were shorter than when he first saw him earlier.  (R. 2474)

John Hines testified that Ed Moore called him in Florida in July, 1991, wanting Hines' mother to launder $5,000 in checks for him and for Hines to send Moore the money. (R. 2463)  In cooperation with a federal agent, Hines arranged to send Moore $100 through Western Union, payable to "Ken Saif." (R. 2464)  After sending the money, Hines repeatedly called Western Union until Western Union reported to him that the money he sent had been picked up at a Western Union office at a bus terminal in New York City. (R. 2465)  Theresa Diaz, a Western Union employee, testified to the transfer draft being picked up at the New York bus terminal and cashed at that location. (R. 2608)

New York City Police Detective William Wagner testified to having arrested Ed Moore at a transient hotel in New York City on July 27, 1991. (R. 2047, 2052)  Moore had an idenitification card for "Ken Saif." (R. 2053)  Moore was placed in a police holding cell with Irwin Johnson and Troy Snell. (R. 2055)  Wagner testified to having heard Moore tell those inmates that "they could not have gotten the prints off the tape it should have burned," and "something like she couldn't have told them who it was." (R. 2061) Johnson, who possessed several felony convictions, testified that Moore told him that he was a painter for a wealthy woman with whom he was having an affair, that they had sex and argued about her husband coming home. (R. 2122)  Moore said that after they fought, he tied duct tape around the woman's wrists and face, took money and jewelry and set her on fire.  Snell testified in rebuttal that Johnson was present with Moore and Snell when Moore said that the police were trying to get him for burning a lady, but they did not have anything on him. (R. 3125)

-17-

C . 018