AFFIDAVIT

I, George Day, state on oath the following to be true to the best of my knowledge and belief:

On or about June, 1991 I contracted Ed. Moore Jr. to do some interior work in my home.

I paid him approximately $1,500.00 for his services.

   FURTHER AFFIANT SAYETH NOT.

George Day
6 Puffin Circle
Bolingbrook, Illinois 60440
708-739-6068

Subscribed and sworn to before me on this 29th day of November, 1993

NOTARY PUBLIC

"OFFICIAL SEAL"
Sandra K. Adams
Notary Public, State of Illinois
My Commission Expires 9/29/96



# THE LEGAL AID SOCIETY

CRIMINAL APPEALS BUREAU • PRISONERS' RIGHTS PROJECT
15 Park Row, New York, N.Y. 10038 (212) 577-3530 FAX # (212) 732-6003

*Executive Director and*
*Attorney-in-Chief*
Archibald R. Murray

*Attorney-in-Charge of the*
*Criminal Appeals Bureau*
Philip L. Weinstein

*Project Director*
John Boston

November 25, 1991

Mr. Nevilles
Associate Director
  of Medical Records
Kings County Hospital
451 Clarkson Avenue
Brooklyn, NY 11203

Re: Edward Moore

Dear Mr. Nevilles:

    I am writing to request the medical records of Mr. Edward Moore. Mr. Moore was treated in the emergency unit of Kings County Hospital on November 14, 1991.

    I am enclosing Mr. Moore's authorization for release of his medical records to Mr. Jonathan Chasan, an attorney with the Prisoners' Rights Project.

    Your prompt response to this request is greatly appreciated.

Very truly yours,

NADINE JOHNSON
Legal Assistant

NJ/sb

encl.

D-1

MEMORANDUM

TO: File
FROM: Nadine A. Johnson  *NaJ*
DATE: November 19, 1991

                RE: Interview with Edward Moore #349-91-18981

The following details my 11/19/91 interview with Edward Moore at the Brooklyn House of Detention.

On November 14, 1991 at approximately 7:15pm or 7:30pm, Edward Moore along with other unidentified inmates were in the process of being escorted by Officer #3286 to Mental Health. Mr. Moore states they were proceeding down the "big hallway of the bridgeway which leads to other cells" (on the fourth (4th Floor).

Along the bridgeway, he was stopped to be frisked by Officer Bennie Gong. Gong asked Mr. Moore to "spread them". Mr. Moore complied. Mr. Moore then took a deck of cards out of his pocket and laid them on the bar. He then placed one hand on the bar. With his free hand he reached into another back pocket to take out his bible. He states that at this point Officer Gong without provocation grabbed Moore by the back of his hair, pulled out the bible and threw it on the floor. Mr. Moore then stated to Officer Gong, "What the fuck you do that for?" Mr. Moore stated that at this time he had both hands on the bar with his legs spread apart. Officer Gong replied, "fuck you" then "smashed" Mr. Moore's head into a mailbox which was directly in front of him. Gong then lifted Mr. Moore's head by grabbing onto his hair and punched Moore directly in the eye. Mr. Moore believes the force of the punch caused him to lose his balance enabling Officer Gong to "drag" Moore to the kitchen area while continuously punching him about the eyes, head, back of head, forehead, right arm and left shoulder. Mr. Moore states he only saw himself being hit by Gong's fist.

Mr. Moore recalls an Officer present during this assault telling Gong, "come on get off of him, leave him alone."

The "probe team" came and took Moore "down stairs." Mr. Moore states it took approximately three(3) hours after this incident before he was taken to KCH. He states the doctor at BHD's clinic told him both ears were hemorrhaging and remarked "you must have been hit pretty hard because the bones around the ears are pretty hard." This doctor's initial prognosis (according to Moore) was that as the result of this incident he sustained a fractured shoulder and possibly fractured ribs.

At KCH Mr. Moore was examined in the emergency "trauma room" by a

Dr. Moore. He states he became upset because his head was pounding, he asked for medication however the Dr. seemed more concerned about his eye. At KCH he took "head x-rays, shoulder x-rays, and was seen at the eye clinic." He couldnot remember the name of the Dr. who examined him in the eye clinic. He states this doctor told him he may lose some vision in his right eye. For this injury he was given eye drops and a two-week follow-up appointment. For the injury to his shoulder he states he was told he sustained a chipped bone to the left shoulder. Here he states he was told it was better to let the bone heal with the help of a sling. Noone has yet provided him with a sling.

Regarding the incident, Mr. Moore states, that only Officer Gong attacked him, no ther Officer laid a hand on him.

INJURIES OBSERVED DURING INTERVIEW

I personally observed the following physical injuries to Mr. Moore:

1. Right Eye- severly bruised, completely bloodshot with redness completely covering the inner eye. It also appeared as if the pupil was swollen(it was raised in the eyeball).

2. Left Eye-redness and slight bruising to the lid.

3. Left Temple- bruised

4. Ears-both were badly bruised behind the ear. The left inner ear was severely bruised.

5. Head-felt one lump. There is evidence of hair missing.(Not strong enough to suggest it was pulled out, however, Moore has some hair which he states was pulled out during this incident.

6. Right Chest-above breast is bruised

7. Ribs-small bruise appearing on both sides of his rib cage.

8. Arms- Right upper arm is severely bruised.

ALLEGED REFUSAL TO SIGN "SOME KIND OF WAIVER"

Mr. Moore states that upon returning from KCH he approached by, he believes, an Officer Robinson who "showed" him a piece of paper with writing on it and said," if you want to sign this statement we'll forget about the whole thing." Moore responded, " I ain't signing nothing."

Mr. Moore states that at no time did he refuse medical treatment. He stated that he has signed up for sick call everday

D-3

C-915

for almost two weeks. He states that the "psych" at one point gave him motrin for his headaches and this "psych" somehow got him seen at the clinic yesterday.

He further stated that he returned from KCH (after the incident) and was given two prescriptions to be filled at BHD. He states he received nothing until Sunday. He was told that he had to sign up for sick call to see the Dr. prior to having his prescriptions filled.

WITNESSES

Mr. Moore gave me a list bearing the names of the following witnesses:

    Mundo Jesus #140-90-25803  (saw all)
    Martin Finger #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 (SPA in the area)
    Miles Ralph # 41-91-09765
    Ghana Frazier # 41-9113107(?)
    Joe Steckler # 541-91-01705
    John Eve # 191-91-14712

INFRACTION Statement

Mr. Moore's infraction report stated the following:

Reporting Officer: CO Rosado #112167

"On 11/14/91 at approximately 1930 hours this writer was doing the 4th fl. "A" post meal relief of CO Archer. CO Benny Gong who was assigned to 4D post by CO Rosado #121167 for a personal relief at which time CO GONG assisted this writer in pat frisking 5 inmates, departing the floor for mental health. At this time inmate Moore, Edward 349-91-18981 4LD5 turned around and punched CO GONG in the chest area. I immediately hit my personal body alarm probe team. Responded Captain Robinson immediately took charge and escorted above inmate off the floor.

You are heheby charged with assault on staff."

Mr. Moore had a hearing this morning.

D-4

MEMORANDUM

TO  : File
FROM: Nadine A. Johnson
DATE: November 26, 1991

RE: 11/22/91 Interview with Martin Finger #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 at BHD regarding Edward Moore's 11/14/91 incident.

Mr. Finger stated he observed the 11/14/91 incident from the "A" side. He saw everything up to the point where Moore was "thrown" into the kitchen by Gong.

Mr. Finger stated the following:

"On 11/14/91 at approximately 7:30pm, Edward Moore was being pat frisked to leave the housing area to see the psychiatrist. While he was being pat frisked, Gong asked him to spread his feet further. Moore could not possibly spread his feet any further. Gong took a bible from Moore's pocket and tossed it on the floor. Edward asked, "what the hell you do that for?" Gong then grabbed Edward by his hair and pushed his head into the mail-box and bar.
    Edward never raised his hands to strike Gong. Edwards hands were on the bar until Gong pushed his head into the mail-box and bar."

Mr. Finger also stated that Officer Rosado closed the door to the kitchen. It was Officer Johnson who told Gong to stop beating on Moore.

Finger said Moore was in the pantry for approximately five(5) minutes with the door closed. He said he went back to the 15 Cell and could hear Moore yell, "help me, help me."

Mr. Finger would like to have Officer Rosado removed from the floor. He stated, "Rosado closed the door. We don't need people like that on the floor."

See the attached diagram drawn ny Martin Finger.

D-5

C·917

MEMORANDUM

TO  : File
FROM: Nadine A. Johnson
DATE: November 29, 1991

RE: 11/22/91 Interview with Jesus Mundo
#140-90-25803 at BHD regarding Edward
Moore's 11/14/91 incident.

Mr. Mundo stated he did not see what triggered the 11/14/91 incident which resulted in the beating of inmate Edward Moore because he was on the telephone at the time and his view was obstructed. His observation began from the kitchen area. He provided the following statement:

"Moore was on the floor in front of the kitchen. Ms. Rosado closed the door. The door opened up a little and she closed it a second time. The door opened again and at the same time Moore dropped to the floor. He [Moore] turned over on his stomach to cover his face. I saw the Chinese Officer on the left side of Moore punching him on the left side of his face. Then the Chinese Officer jumped over to the right side and mercifully, non-stop machine punching Moore. The kid was yelling, help me, please help. The Chinese Officer continued to punch Moore in the back of his head. Then there were punches which landed randomly all over the place [by this same Chinese Officer].

The probe team dragged Moore out of the kitchen. There was an Officer telling the Chinese Officer that's enough."

Mr. Mundo told me the kitchen was where they "tear you up." (Please see the attached diagram by Mundo).

D-6

C·918

CONCERNS OF MR. MUNDO

Prior to giving me the above statement Mr. Mundo told me that an unidentified Captain took him to the kitchen and said "I understand you have a list of names of those who saw the Edward Moore Incident." He told Mr. Mundo he was investigating the incident and requested a list. Mr. Mundo stated he was afraid he was going to get beat up because the Captain took him to the kitchen and that's where they beat inmates. He told this Captain that the list was in his cell. He asked Mundo to retrieve it and give the list to him. He also gave Mundo an "inmate voluntary statement to complete. Mr. Mundo does not want to write any statement.

After receiving the list from Mundo this Captain, once again, took Mundo to the kitchen and questioned him about the incident. Mr. Mundo stated that this Captain kept asking him if he was assuming and Mundo continually stated, "no, I saw..."

Mr. Mundo stated that after the 11/14/91 incident a Mr. Frazier who resides on 4LD13 tried to give a statement to an Officer who was taking them but this officer refused.

Mr. Mundo is afraid that he and those on the witness list he gave to the captain will be retaliated against by prison officials. I showed him the list I obtained from Moore during that interview. It was the same names of those submitted to the captain--Mr. Mundo prepared both list.

**THE CITY OF NEW YORK**

## DEPARTMENT  OF HEALTH

| | |
|---|---|
| **TELEPHONE** | 324 |
| **ROOM NUMBER** | |
| **DATE** | November 18, 1991 |
| **TO** | Warden L. J. Freckleton, BkHDM |
| **FROM** | J.B. Saoud, Chief of Services, Mental Health |
| **SUBJECT** | Inmate Edward Moore (B&C # 349-91-18981; 4L A10 |

On November 14, 1991 the above mentioned inmate was allegedly involved in an "assault on staff" incident. The inmate was referred to KCH for treatment and x-ray.

It was brought to my attention that on the fourth floor there are more than five eye-witnesses who are willing to testify that what actually occurred completely contradicts the incident report contents as to what precipitated the incident, as well as to what occurred afterwards. In my opinion, the extent of the injury suggest a very poor practice of 'restraining' even if the inmate is 'assaultive.'

Therefore, I am requesting that a full investigation take place to find out what exactly occurred at the time in question and to assess if the use of force by the involved officer was warrented.

I would appreciate your immediate attention to this matter.


cc: M. Lewis
    File


GA 13 (8/8J)

D-8

C · 950





D-9
C 051





D-10
C. 052

GRUNDY COUNTY HEALTH DEPARTMENT
MENTAL HEALTH CENTER

## Client Contact Record

**CLIENT:** Moore, Edward    **THERAPIST:** Costello

| DATE | NOTES |
|---|---|
| 1/17/92 | Jail Visit – S – Continue sve hx for medication eval by Dr. Gonzales. Client relates he had not had any contact w/ his father for a number of years. At this time he reports that his closest relative is his aunt Kathy. Client was born in Chicago but spent most of his life living in suburb namely Hinsdale. Edward has been in the Illinois State Penal system in both maximum and medium security. The reason for the different levels is due to reasons inside the prisons and not related to his offenses, per client. Edward denies use of illegal drugs other than marijuana and cocaine. He is continuing to experience difficulty sleeping and states that he does not sleep during day hours and very little during night hours. Edward reports no history of medical problems. He was prescribed medication allegedly while in N.Y. jail but did not feel that it helped him. He relates that he did try Thorazine while incarcerated (from another inmate) and that this helped him to sleep.  R/O antisocial Personality Disorder.  M. Costello M.A.E |
| 2/27/92 | See psychiatric record this date.  M. Costello M.A.E |

GRUNDY COUNTY HEALTH DEPARTMENT
MENTAL HEALTH CENTER

Client Contact Record

CLIENT: Moore, Edward                    THERAPIST: _____

| DATE | NOTES |
|---|---|
| 1/16/92 | (con't) he was making decisions to not let other inmates initiate conflict nor was he going to do so. |
| | Plan: Psychiatric eval for medication. Follow up appt w/ counselor to take relevant history. |
| | M. Costello, M.A.-E |

GRUNDY COUNTY HEALTH DEPARTMENT
MENTAL HEALTH CENTER

Client Contact Record

CLIENT: Moore, Edward            THERAPIST: _____

| DATE | NOTES |
|---|---|
| 1/16/92 | Id: Edward is a 35 yr 2 mth old, cauc, male currently incarcerated in Grundy County jail. He is of average to low average height and weight. His grooming appears fair though slightly unshaven. |
| | Chief complaint: having difficulty sleeping. Requests eval for medication. |
| | Edward related that he doesn't have a relationship with his sibs. He did not talk about his parents. States he would like to see his girlfriend while in jail but was told recently that she was not permitted to visit him. Edward relates that he has been incarcerated in past and was transferred back to Grundy County from New York. He expressed some confusion as to why he was not advised more about what was happening to his case while incarcerated. |
| | M.S. oriented to time, place, and person. His thoughts were not tangential. He did not report experiencing any auditory hallucinations nor did he appear to be responding to voices. [Edward understands] that he would not receive a medication until next clinic day 1/27/92. He admits to feeling depressed [sometimes] in the past but currently does not have [suicidal ideation or] plan. He was able to volunteer that |

STATE OF ILLINOIS )
                 ) SS
COUNTY OF GRUNDY )
I, Karen E. Slattery, Clerk of the Circuit Court in and for said County, in the State aforesaid, do hereby certify this copy to be a true and correct copy of
[illegible] separate from the record and file
now in this office remaining.
Karen E. Slattery, Circuit Clerk

MH 10   10/84                    E-3
                                 C-955

# APPENDIX B

FIRST DIVISION
September 30, 2004

No. 1-03-2096

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 86 CR 16841 |
| | ) | |
| D'ARTHAGAN SARGENT, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GORDON delivered the opinion of the court:

Petitioner, D'Arthagan Sargent, appeals the summary dismissal of his postconviction petition at the second stage of review. He contends that the employment of the summary dismissal procedure, only authorized during the first stage of review by the Post-Conviction Hearing Act (725 ILCS 5/122.2.1(a) (West 2002)), at what was only designated a status hearing, violated his due process rights. He further argues that remand is required because his postconviction attorney failed to certify that he consulted with petitioner, reviewed the record, and modified the petition as necessary so as to adequately present petitioner's contentions, as required by Supreme Court Rule 651(c) (134 Ill. 2d R. 651(c)). The State concedes that the procedure employed by the circuit court was improper and that there is no showing of compliance with Rule 651(c) by postconviction counsel. However, the State contends that any error was harmless as petitioner could under no circumstances have prevailed on the substance of his petition. We affirm.

I. FACTUAL BACKGROUND

Petitioner was sentenced to a term of 80 years in prison on August 26, 1987, after being convicted by a jury of first degree murder. Petitioner's direct appeal was denied in People v. Sargent, 207 Ill. App. 3d 631 (1990). On January 30, 2001, petitioner filed his instant postconviction petition, alleging that his sentence was based on a finding that the murder was accompanied by exceptionally brutal and heinous conduct, a statutory enhancement that was never charged in his indictment or submitted to the jury for proof beyond a reasonable doubt. Petitioner therefore contended that his sentence violated the Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

The circuit court allowed the petition to proceed to the second stage of review and appointed the public defender to represent petitioner in postconviction proceedings. After a series of continuances, postconviction counsel and the State appeared before the circuit court on June 12, 2003, for a status hearing. Postconviction counsel informed the court that the petition was

based on Apprendi, and that one of her colleagues at the public defender's office would file a supplemental petition by the next court date. The court, however, in spite of no motion to dismiss by the State, indicated that it was ready to dispose of the case at that time. Noting the Illinois Supreme Court's decision in People v. De La Paz, 204 Ill. 2d 426, 791 N.E.2d 489 (2003), which barred retroactive application of Apprendi to cases where direct appeals had been exhausted as of the date of the Apprendi decision, the court dismissed the petition. The court denied petitioner's motion to reconsider on the same grounds.

Leading up to the dismissal, there had been no indication from postconviction counsel of any meeting with petitioner, nor of any review of his trial record. Postconviction counsel likewise never filed any certificate to verify compliance with Rule 651(c). Rule 651(c) provides:

"c) Record for Indigents; Appointment of Counsel. Upon the timely filing of a notice of appeal in a post-conviction proceeding, if the trial court determines that the petitioner is indigent, it shall order that a transcript of the record of the post-conviction proceedings, including a transcript of the evidence, if any, be prepared and filed with the clerk of the court to which the appeal is taken and shall appoint counsel on appeal, both without cost to the petitioner. The record filed in that court shall contain a showing, which may be made by the certificate of petitioner's attorney, that the attorney has consulted with petitioner either by mail or in person to ascertain his contentions of deprivation of constitutional right, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." 134 Ill.2d R. 651(c).

Petitioner appeals.

## II. ANALYSIS

To begin, the State is entirely correct that the petition has no substantive merit. Our supreme court has conclusively determined that Apprendi cannot form the basis of a collateral attack when a petitioner exhausted his direct appeals prior to the Apprendi decision. De La Paz, 204 Ill. 2d 426, 791 N.E.2d 489. Consequently, as under no circumstances, under De La Paz, could the ruling of the circuit court ultimately have been different, in our view, any procedural error would have been harmless. See People v. Taylor, 349 Ill. App. 3d 718, 720, 812 N.E.2d 581, 583 (2004) ("[w]e may look beyond any alleged procedural defect where, as in this case, defendant's petition raised a pure question of law, was frivolous and completely without merit, and no prejudice resulted from the trial court's dismissal").

Petitioner contends nevertheless that, because of the unforewarned transformation of the status hearing into a dispositive proceeding, we are compelled to reverse pursuant to People v. Kitchen, 189 Ill. 2d 424, 727 N.E.2d 189 (1999), and People v. Bounds, 182 Ill. 2d 1, 694 N.E.2d 560 (1998). We, however, disagree.

In both Kitchen and Bounds, our supreme court reversed the dismissal of postconviction petitions when the circuit court dismissed those petitions at hearings that had been designated only for consideration of discovery issues, not for any review of the merits. Kitchen, 189 Ill. 2d at 434-35, 727 N.E.2d at 194-95; Bounds, 182 Ill. 2d at 5, 694 N.E.2d at 562. In both cases the supreme court noted that the surprise shift in the proceedings was in violation of constitutional due process. Kitchen, 189 Ill. 2d at 434-35, 727 N.E.2d at 194-95; Bounds, 182 Ill. 2d at 5, 694 N.E.2d at 562. In concluding its analysis, the Kitchen the court stated: "[W]e *** mean to send a clear message to both bench and bar that the protection of a defendant's right to procedural

due process in post-conviction proceedings is of critical importance. We trust that such violations will not soon be repeated in our courtrooms." Kitchen, 189 Ill. 2d at 435, 727 N.E.2d at 194-95. Thus, under a superficial reading of Kitchen and Bounds, petitioner's contentions might appear to have merit. However, a more thorough review of those cases reveals their inapplicability to the present case.

The opinions in Bounds and Kitchen give no indication that any claims of harmless error were ever raised by the State. Nor does it appear that a harmless error contention could have prevailed under the specific facts postured in those cases. At the time of the dismissal of their postconviction petitions, in both Kitchen and Bounds, the petitioners were still in the process of seeking discovery of police records to support their respective claims of constitutional deprivation. Kitchen, 189 Ill. 2d at 428-31, 727 N.E.2d at 191-92; Bounds, 182 Ill. 2d at 3-5, 694 N.E.2d at 561. In Kitchen, the constitutional claim was ineffective assistance of counsel. The constitutional violation alleged in Bounds is unarticulated. There is no indication that given sufficient opportunity through discovery the petitioners in Kitchen and Bounds would not have found data which could well have supported the grounds urged in their petitions. This may well explain why in Kitchen and Bounds the State did not appear to advance a harmless error claim for the court to consider. However, we detect no similar possibility of prejudice here where the question presented was purely a question of law and, as indicated previously, a previously settled question under De La Paz. Thus although counsel in this case may have been similarly surprised by the judge's sudden decision to address the merits of the petition, petitioner could have suffered no prejudice because there was nothing to be done to support his barred Apprendi claim.

Petitioner still contends, however, that demonstrated compliance with Rule 651(c) is an inflexible procedural requirement and, therefore, "whether the claims contained in the petition itself sufficiently allege constitutional violations is irrelevant, as the failure to comply with Rule 651(c) is reversible error, even where the petition itself fails to present a substantial constitutional question." We again disagree. We conclude that harmless error may apply to Rule 651(c) violations and find that to be the only kind of error that occurred here.

As a general matter, courts have held that "[i]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless." People v. Benson, 266 Ill. App. 3d 994, 1003, 641 N.E.2d 617, 624 (1994); accord People v. Reese, 121 Ill. App. 3d 977, 986-87, 460 N.E.2d 446, 452-53 (1984). Moreover, courts may not ignore harmless error considerations merely as a means to chastise improper or poor performance in the trial court. See Reese, 121 Ill. App. 3d at 987, 460 N.E.2d at 452-53, quoting United States v. Hasting, 461 U.S. 499, 507, 76 L.Ed.2d 96, 105, 103 S.Ct. 1974, 1979 (1983) ("the interests preserved by the doctrine of harmless error cannot be so lightly and casually ignored in order to chastise *** prosecutorial overreaching"). Harmless error analysis is applied to most constitutional violations (Benson, 266 Ill. App. 3d at 1003, 641 N.E.2d at 624), including Apprendi violations (People v. Thurow, 203 Ill. 2d 352, 368-71, 786 N.E.2d 1019, 1028-29 (2003)), and even to "reprehensible trial conduct" (People v. Carbona, 27 Ill. App. 3d 988, 1011, 327 N.E.2d 546, 566 (1975)). Considering that a postconviction petitioner does not even have a constitutional right to counsel (People v. Rials, 345 Ill. App. 3d 636, 641, 802 N.E.2d 1240, 1244 (2003)), and that the level of representation a petitioner is statutorily entitled to in postconviction proceedings is less than what he would be entitled to at trial (Rials, 345 Ill. App. 3d at 641, 802 N.E.2d at 1244), *a fortiori* it would be proper to conduct a harmless error analysis in cases involving alleged violations of Rule 651(c).

The foregoing is consistent with the approach our supreme court has already taken in other contexts involving noncompliance with Rule 651(c). For example, in People v. Turner, our supreme court rejected a postconviction petitioner's claim that his postconviction counsel violated Rule 651(c) by failing to appropriately review his trial record when the petitioner could not identify what information useful to his claims was contained in the hearing transcripts that postconviction counsel never saw. People v. Turner, 187 Ill. 2d 406, 411, 719 N.E.2d 725, 728 (1999). The Turner court stated "[t]o require counsel to examine portions of the record which have no relevance to petitioner's claims would be an exercise in futility." Turner, 187 Ill. 2d at 412, 719 N.E.2d at 729. Similarly, in People v. Dodd, the supreme court refused to find a violation of the rule, based on counsel's alleged failure to appropriately modify the original petition, when the petitioner could not demonstrate what allegations were omitted, or otherwise how the original petition should have been amended. People v. Dodd, 58 Ill. 2d 53, 56, 317 N.E.2d 28, 30 (1974); see also People v. Henderson, 215 Ill. App. 3d 24, 26, 574 N.E.2d 268, 270 (1991) (finding no Rule 651(c) violation when "[d]efendant has not offered any recommendation as to how counsel could have otherwise improved the petition" and when the "pro se petition is in fact well drafted and not conclusional"). Finally, in People v. Leach, the appellate court refused to remand a postconviction petition alleging the imposition of an unconstitutional sentence, for violations of Rule 651(c). People v. Leach, 284 Ill. App. 3d 4, 672 N.E.2d 835, 837 (1996). The Leach court observed that, as its petitioner had received his sentence after pleading guilty, he could only challenge his sentence after moving the trial court to withdraw his plea and vacate his judgment, even if done in the course of the postconviction proceeding. Leach, 284 Ill. App. 3d at 6-7, 672 N.E.2d at 836-37. As the petitioner had not done so, the court affirmed the dismissal of the petition. Leach, 284 Ill. App. 3d at 6-7, 672 N.E.2d at 836-37.

Thus, the mere violation of Rule 651(c) is not enough to warrant reversal when, in the particular context in which the error occurred, as in this case, it clearly could not have had a prejudicial impact on the petitioner. As discussed above, here, petitioner's claim was doomed to failure regardless of any action of counsel as our supreme court in De La Paz found Apprendi not to be retroactive, effectively barring all collateral attacks based on Apprendi when a petitioner, like this one, had already exhausted his direct appeals before the Apprendi decision. Thus, no amount of scouring the record, nor multiple meetings with petitioner, nor any amendment of the petition, could have saved the Apprendi claim from ultimate dismissal. [1] We find the present situation to be akin to that faced by the court in Owens v. Snyder, which stated: "If the trial court had followed the *** [statutory procedure,] plaintiff would be in the same position he now is in. Dismissal of his complaint was inevitable. Plaintiff requests this court to reverse and remand for further proceedings. Such action would have little remedial effect, only delaying dismissal." Owens v. Snyder, 349 Ill. App. 3d 35, 45, 811 N.E.2d 738, 746 (2004).

Petitioner, nevertheless argues that People v. Alexander, 197 Ill. App. 3d 571, 554 N.E.2d 1078 (1990), which applied a harmless error analysis as to the mere procedural failure to file a certificate of compliance, nevertheless requires reversal regardless of prejudicial impact when, as here, there is no demonstration of counsel's substantive compliance, namely, that he reviewed the trial record and consulted with the petitioner. We disagree. In Alexander and the cases on which it relied, People v. Brown, 52 Ill. 2d 227, 287 N.E.2d 663 (1972), and People v. Jones, 43 Ill. 2d 160, 251 N.E.2d 218 (1969), there is no indication that the failure of counsel to substantively comply with Rule 651(c) was not prejudicial. In fact, there is a contrary indication that had counsel in those cases been in substantive compliance, it may well have effected the subsequent outcome. For example, in Alexander, the court was concerned by the failure of the

record to reflect counsel's review of the record when he failed to counter the State's arguments based on the trial evidence and trial proceedings. Alexander, 197 Ill. App. 3d at 573, 554 N.E.2d at 1079. And, in Brown, the court suggested that postconviction counsel might have discovered that some of the fourth amendment claims alleged by the petitioner were not barred by *res judicata* or waived, as alleged by the State, had he reviewed the trial record. Brown, 52 Ill. 2d at 230, 287 N.E.2d at 665. By contrast, in this case, as we explained above, there was no conceivable act counsel could have taken in this case to avoid the legal bar to petitioner's Apprendi claim presented by De La Paz. We therefore find that "[w]e may look beyond any alleged procedural defect where, as in this case, defendant's petition raised a pure question of law, was frivolous and completely without merit, and no prejudice resulted from the trial court's dismissal." People v. Taylor, 349 Ill. App. 3d 718, 720, 812 N.E.2d 581, 583 (2004). We will therefore not reverse and remand this case based on postconviction counsel's violation of Rule 651(c).

Finally, regarding petitioner's contention that the circuit court committed reversible error by summarily dismissing his petition at the second stage of review when the Act only provides for summary dismissal at the first stage, we again only find harmless error. This court recently addressed a similar issue in People v. Anderson, No. 1-03-1615 (2004). There we recognized that summary dismissal of an Apprendi claim, even if procedurally erroneous remains subject to harmless error analysis and that, where the Apprendi challenge was barred by De La Paz, summary dismissal, even if regarded as procedurally erroneous, was harmless. See Anderson, slip op. at 18-21; accord Taylor, 349 Ill. App. 3d at 720, 812 N.E.2d at 583. Therefore, as there is no hope for petitioner's claim, as previously explained, we find only harmless error in the summary dismissal of his petition at the second stage.

Affirmed.

CAHILL and McBRIDE, J.J., concur.

1. We note that we only need to consider the alleged Rule 651(c) violation in the context of the presentation of petitioner's Apprendi claim as the Act provides counsel only to "shape [a petitioner's original claims] into appropriate legal form, and [to] present them to the court," not "for purposes of exploration, investigation and formulation of potential claims." People v. Davis, 156 Ill. 2d 149, 162-63, 619 N.E.2d 750, 757-58 (1993).